# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAHN G. THOMPSON, | Case No. 1:07 cv 01299 LJO GSA PC |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATION RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| C/O LEE, et al., | |
| Defendants | (ECF NO. 113) |
| | OBJECTIONS DUE IN THIRTY DAYS |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This proceeding was referred to this court by Local Rule 302 pursuant to 28 U.S.C. § 636(b)(1).   Pending before the Court is Defendants' motion for summary judgment.  Plaintiff has opposed the motion.[1]

## I.   Procedural History

This action proceeds on the November 10, 2009, second amended complaint, filed in response to an earlier order dismissing the first amended complaint and granting Plaintiff leave to file an amended complaint.  Plaintiff, currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) at  CSP Corcoran, brings this action against defendant

---

[1] Defendants' motion for summary judgment was filed on March 10, 2014.  On June 6, 2011, the Court issued and served Plaintiff with the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988)(ECF No. 35.)  On August 23, 2012, the order was re-served in response to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).

1

correctional officials employed by the CDCR at Pleasant Valley State Prison (PVSP).   Plaintiff names the following Defendants: Sergeant Green; Sgt. Huckabay; Correctional Officer (C/O) Tucker; C/O Lee; C/O Rincon; C/O Hernandez; C/O Deathriage.

On March 24, 2011, an order was entered, finding that the Second Amended Complaint stated colorable claims and granting Plaintiff leave to file an amended complaint or proceed on the claims found by the Court to be cognizable.  Plaintiff notified the Court of his intention to proceed only on the cognizable claims.  The Court therefore ordered service on the following claims;  against Defendant C/O Tucker for subjecting Plaintiff to adverse conditions of confinement; against Defendants C/O Tucker, Sgt. Green, C/O Lee, C/O M. Hernandez, C/O Rincon, C/O Deathridge and Sgt. Huckabay for failure to protect; against C/O Tucker, Sgt. Green and Sgt. Huckabay for retaliation; against Defendants C/O Tucker, C/O Thompson and C/O Melendez for excessive force.  On June 8, 2011, an order was entered by the District Court, dismissing the remaining claims and Defendants.

Defendants filed a motion to dismiss for failure to exhaust administrative remedies and the Magistrate Judge entered finding and recommendations that the motion be granted in part. On February 8, 2013, an order was entered by the District Court, adopting in part the findings and recommendations.  The District Court dismissed Plaintiff's claims regarding retaliation, adverse conditions of confinement and excessive force.  The District Court further ordered that this action proceed against Defendants Tucker, Green, Lee, Rincon, Hernandez, Deathridge and Huckabay for failure to protect Plaintiff in violation of the Eighth Amendment.  On April l9, 2013, Defendants filed an answer to the complaint.   All of the remaining Defendants filed the motion for summary judgment that is before the Court.  Plaintiff has opposed the motion. Defendants have filed a reply.

## II.   <u>Allegations</u>

While Plaintiff was housed at Pelican Bay State Prison, he became aware that he would be a victim of an attack by another inmate.  After an investigation, prison officials determined that Plaintiff should be removed from the general population and housed in administrative

segregation under safety watch.  Plaintiff continued to receive death threats and was placed on single cell status under protective custody watch.  On November 22, 2005, the Institutional Classification Committee decided that Plaintiff should be transferred to a sensitive needs yard at another prison and should remain on single cell status.

In December 2005, Plaintiff was transferred to PVSP.  When it became known that Plaintiff was at PVSP, he was threatened with attacks.  Plaintiff immediately informed C/O Tucker, Sgt. Green and Sgt. Huckabay.  Plaintiff requested to be placed in protective custody. Plaintiff informed C/O Tucker, Green and Huckabay of the written documentation in Plaintiff's prison records.   Plaintiff alleges that all of the named defendants deliberately refused to consider Plaintiff's safety concerns.

In January 2006, Plaintiff was assaulted by a Crips gang member as he was exiting the shower.  Plaintiff filed an inmate grievance (CDCR Form 602).  An investigation was conducted, and the appeals examiner confirmed that Plaintiff was defending himself.   Tucker, Green and Huckabay became very angry about Plaintiff's complaints about his safety and told him he would get "dealt with."  Shortly thereafter, Plaintiff was removed from his single cell and ordered by C/O Tucker to share a cell with a known Bloods gang member.  C/O Tucker ordered Plaintiff to keep his mouth shut.  Plaintiff's records contain documentation that he should not be housed with any Crip or Blood gang member, or any Radical Muslim.  Defendants Tucker, Green, Huckabay, Hernandez, Rincon, Deathridge and Lee were repeatedly informed by Plaintiff of his safety issues and concerns, but they all refused to provide Plaintiff with safe housing. Plaintiff continued to file complaints requesting to be placed in protective custody, but no one would listen or help him.  He was finally removed from the cell, but only for a short period.

In October 2006, C/O Tucker ordered Plaintiff to accept a Radical Muslim inmate as a cellmate.  Plaintiff again informed Tucker that he would be in grave danger, begged Tucker not to force him to be housed with a documented enemy, and repeatedly requested protective custody.  Tucker left and returned with several other officers and loudly ordered Plaintiff to follow orders.  Plaintiff protested, informing Tucker that he had been attacked by two of the

Muslim inmate's associates at Pelican Bay State Prison.  Tucker pushed Plaintiff aside and told the Muslim inmate to enter his cell.  Shortly thereafter, when Plaintiff was asleep, his cellmate assaulted him, resulting in Plaintiff being taken to the prison infirmary.

Later in October 2006, Plaintiff was ordered by C/O Lee to move into another building and share a cell with inmate Miller.  Plaintiff emphatically informed Lee that Miller was his enemy, an active Bloods gang member, and that there was documentation in Plaintiff's file showing he should not be housed with a Bloods gang member.  Lee refused to show concerns for Plaintiff's safety and told Plaintiff he would "throw my ass in the hole if I don't get out of his sight." (Am. Cmpl. ¶ 21.)  Plaintiff informed C/O Lee that the inmate who attacked him a few weeks ago was housed in the other building, and made Lee aware of the documentation in his file.  Lee ignored Plaintiff's concerns.  As Plaintiff was moving to the other building he was approached outside by inmate Miller who said "Nigga I don't want you in my cell."  The two inmates argued and were separated by other inmates before a fight started.  Sgt. Green said they "should've fought and then Thompson's ass would have been thrown in the hole." (Am. Cmp. ¶ 24.)  Plaintiff pleaded with Sgt. Green for his safety, but Sgt. Green ignored him and ordered him to enter the building.

Plaintiff  entered the building but refused to enter the cell.  He approached the floor officer, C/O Deathriage, and told him about the dangerous enemy situation with inmate Miller and the earlier assault by the Muslim inmate.  Plaintiff also told C/O Deathriage about the documentation in his file.  C/O Deathriage made a phone call and afterward C/O Tucker arrived, moved inmate Miller's property from the bottom bunk to the top bunk, and ordered Plaintiff to move in.  Plaintiff refused to enter the cell.  He approached floor officers C/O Rincon and C/O Hernandez, informed them about his two enemies in the building and asked to be housed in another building.  C/O Hernandez pushed Plaintiff into the cell and shut the cell door.  Plaintiff continued to complain about his situation to the defendants.  Sgt. Green told him to "handle it." On November 14, 2006, inmate Miller attacked Plaintiff, stabbed him twice, cut Plaintiff's neck and eye, and stabbed him in the left arm.

### III.     Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denial of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985)(aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

## IV.   <u>Failure to Protect</u>

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832-33 (1994); <u>Hearns v. Terhune</u>, 413 F.3d 1036, 1040 (9th Cir. 2005). A prisoner seeking relief for an Eighth Amendment violation must show that the officials acted with deliberate indifference to the threat of serious harm or injury to an inmate. <u>Gibson v. County of Washoe</u>, 290 F.3d 1175, 1187 (9th Cir. 2002). "Deliberate indifference" has both subjective and objective components. A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. Liability may follow only if a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id</u>. at 847.

Regarding the process of housing inmates in protective housing in general, Defendants submit the declaration of A. Avila, Security Threat Group (STG) Sergeant.  Sgt. Avila's declaration establishes the following:

> One of the primary responsibilities of the STG Unit is to investigate and gather intelligence concerning gang activity within PVSP.  I personally conduct investigations and also supervise a staff of investigators, monitoring their progress.

> Sensitive Needs Yards were established to provide protective housing for inmates that could not safely program on a general population yard.  An inmate was typically placed on a Sensitive Needs Yard for reasons that may have made him a target of violence at the hands of other inmates.  For example, an inmate may be placed on a Sensitive Needs Yard based on his commitment offense, medical needs, age or status as a gang dropout.

> Since the creation of the Sensitive Needs Yards, gangs have developed that operate only on the Sensitive Needs Yards. Members of these Sensitive Needs Yard gangs may be validated as active gang members and will typically be kept on the yard unless there is documentation showing that they pose a threat to other inmates.  Members of these Sensitive Needs Yard gangs are the only validated active gang members that would be present on a Sensitive Needs Yard.

> Validated and active members of other prison and street gangs and disruptive groups, such as the Bloods and Crips, are not housed on Sensitive Needs Yards.   In my experience, neither the Bloods nor the Crips are active on PVSP's Sensitive Needs Yards.

> Any validated Prison gang member/associate who wants to be placed on a Sensitive Needs Yard must first complete the debriefing process.

> Debriefing is the process by which a gang coordinator/investigator determines whether an inmate has dropped out of a gang.  An inmate will typically be debriefed upon his request, although staff may ask an inmate if he wants to debrief.  Debriefing involves a two-step process that includes an interview phase and an observation phase.

> The purpose of the debriefing interview is to provide staff with information about the gang's structure, activities and affiliates. The object of a debriefing is to learn enough about the subject and the subject's current gang to: (1) allow staff to reasonably conclude that the subject has dropped out of the gang, and (2) allow staff to reclassify the subject based upon the inmate's needs in conjunction with the security of the institution, as well as, the safety and security of staff and other inmates.

The primary purpose of debriefing is to test the sincerity of the inmate's renunciation of all gang involvement.

Once an inmate has debriefed, he will proceed through the reclassification process as described below, and then may be housed on a Sensitive Needs Yard, if appropriate.

Inmates who have not been validated, but who are affiliated with a street gang, must also renounce their gang affiliation before being eligible for placement on a Sensitive Needs Yard.

In such cases, an investigating officer is assigned to interview that inmate regarding that inmate's gang affiliation.

During the interview, the investigating officer's main focus is to assess whether the inmate's desire to disassociate himself from a gain with which he is affiliated is sincere.

After the interview, the investigating officer drafts a report and makes a recommendation regarding the inmate's suitability for placement on the Sensitive Needs Yard.

If a recommendation for Sensitive Needs Yard placement is made, the inmate must appear before the Institution Classification Committee (ICC) and be reclassified as a Sensitive Needs Yard inmate before he will be placed on a Sensitive Needs Yard.

The ICC reviews the inmate's central file, including any information concerning that inmate's prior gang involvement and debriefing, reviews the investigating officer's report, and holds a hearing to determine that inmate's suitability for placement on a Sensitive Needs Yard.

The investigating officer also presents his findings to the ICC during a hearing.

Based on the information before it, the ICC renders a final decision regarding whether that inmate should be reclassified and placed on the Sensitive Needs Yard.

I have interviewed several inmates as part of this process.

In my experience, the process is successful.  Inmates who have debriefed and inmates who have renounced their gang affiliation do not participate in gang activities after being placed on the Sensitive Needs Yard.

Given the above procedures, it is very unlikely that inmates wanting to be involved in gang activity are placed on a Sensitive Needs Yard.

Although there may have been *former* members of the Bloods and Crips on PVSP's Sensitive needs Yard in 2006, active members of

the Bloods and Crips were not housed on the Sensitive Needs Yard in 2006.

As such, Inmate Thompson would not have been threatened by an inmate acting on behalf of the Bloods or Crips when he was housed on PVSP's Sensitive Needs Yard on 2006.

(Declaration of A. Avila, ¶¶ 1-23.)

In order to prevail on summary judgment, each Defendant must come forward with evidence that establishes the lack of a triable issue of fact – evidence that they did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  As noted, a prison official is deliberately indifferent only if the official knows of and disregards an excessive risk to an inmate's safety; "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); Farmer, 511 U.S. at 837.  See  also Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir. 1996)("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); Taylor v. List, 880 F.2d 1040, 1045 n. 3 (9th Cir. 1989)(to raise a triable dispute of fact a declarant's statement must be based on personal  knowledge).

## A.   **Defendant Lee**

Plaintiff alleges that Defendant Lee failed to protect him from inmate Miller.  Defendant Lee supports his motion with his own declaration.  Defendant Lee's declaration establishes the following:

 I have been employed by the California Department of Corrections and Rehabilitation since 1998.  At all relevant times, I was employed at Pleasant Valley State Prison (PVSP) as a Correctional Officer.

As a Correctional Officer, I did not have direct access to an inmate's confidential enemy list and did not know the identity of an individual inmate's enemies.

Upon arriving at PVSP, an inmate would have appeared before the Institution Classification Committee (ICC).  The ICC would review his enemy list to make sure that he was not placed on the same facility as an enemy.

9

An inmate's Correctional Counselor also monitored the inmate's enemy list on a regular basis.

Safeguards were in place to ensure that an inmate would not be placed on the same facility as a documented enemy.

Given that Thompson's allegations occurred over seven years ago, my memory of Thompson and the events is vague.

I do remember Thompson telling me that he had enemy or safety concerns regarding his cellmate, inmate Miller.

I also recall that I spoke to both Thompson and Miller about Thompson's concerns.

Thompson expressed only vague and general concerns regarding inmate Miller.

I remember inmate Miller being surprised that Thompson had expressed such concerns.   Inmate Miller mentioned that he did not have a problem with Thompson, that he had not threatened Thompson in any way, and did not have any intention of doing so.

I reported the information I gathered from Thompson and Miller to my Sergeant, who I believed conducted an investigation.

Once I reported Thompson's concerns and Miller's responses to my Sergeant, I had no further involvement.   I was not involved in any subsequent investigation or in the decision regarding whether Thompson should be moved to another cell or off the yard.

I believe that, following the report to my Sergeant, Thompson was pulled out of his cell and his central file was reviewed by the Facility Lieutenants, who later informed me that Thompson did not have any enemies on the yard.

As a Correctional Officer, I followed established protocols to ensure that Thompson's safety concerns were addressed.

I have reviewed Thompson's Second Amended Complaint and understand that he alleges his concerns regarding inmate Miller stemmed from his belief that Miller was an active member of the Bloods street gang.

No active members of the Bloods would have been present on the Sensitive Needs Yard in 2006.  Any validated prison gang or disruptive group member or associate who wanted to be placed on a Sensitive Needs Yard must first complete the debriefing process, during which he was required to renounce his gang affiliation.

(Lee Decl. ¶¶ 1-16.)

10

Defendant Lee's evidence establishes the lack of existence of a triable issue of fact.  C/O Lee's evidence establishes that he did not have any knowledge that Plaintiff was exposed to a particular threat, and there are no facts from which Lee could infer a specific threat of harm to Plaintiff.   That Plaintiff may have been in fear of attack based upon race, religious or gang classification does not subject  Lee to liability for failure to protect Plaintiff.  There must be evidence that Defendant Lee knew of the particular danger to Plaintiff's safety.

Plaintiff's opposition consists of 30 pages of argument, titled as a statement of disputed facts, along with exhibits that include documents from Plaintiff's central file.  Because Plaintiff has signed the opposition under penalty of perjury, the Court will consider it as a declaration in opposition to the motion.  Throughout his declaration, Plaintiff repeatedly states that he told Defendants  about his safety concerns:

> I was given a direct order by Defendant Lee to move into Bld. A/3 cell #120; I adamantly informed Officer Lee that Inmate Miller is presently living in said cell -#120 & Miller is my enemy & an active gangbanger of the Blood's gang & there is prison records w/ vivid documentation, that I am NOT to be housed w/ any Blood gang member; C/O Lee totally refused & deliberately neglected to show any concerns for my safety.

(Pltf.'s Opp'n, p. 9.)

In his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears.  Regarding inmate Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all." (Pltf.'s Dep. 11:18:07.) Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no." (Id. 11:33:20.)

Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller.  I did not know Inmate Miller. (Id. 11:50:19.)

The evidence establishes, without dispute, that C/O Lee did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  Plaintiff's evidence establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not.  Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an opposing gang, Plaintiff would still fall short of the Eighth Amendment standard.  The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate. Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1160 (9th 2013).   The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that  Lambert posed a specific threat to the Plaintiff.  The Plaintiff had not come forward with evidence establishing that Lambert was a documented enemy of Plaintiff's, or that there was some particular information that Defendants knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns."  That is the case here.  Plaintiff's evidence establishes at most, a generalized fear of harm.  Defendant Lee has come forward with evidence that establishes, without dispute, that he did not know of the specific harm to Plaintiff.  Judgment should therefore be entered in Defendant Lee's favor.

### B.    Defendant Tucker

Regarding the events at issue, Defendant  Tucker's declaration establishes the following:

> Until my retirement in 2012, I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a Correctional Officer at Pleasant Valley State Prison (PVSP). I began my employment with CDCR in 1986 and started working at PVSP in 1994.

> As a Correctional Officer, I did not know the identity of an individual inmate's enemies.

12

An inmate's Correctional Counselor monitors the enemy lists to make sure that enemies are not placed on the same yard.

Moreover, upon their arrival at PVSP and on an, at least, annual basis, inmates would have appeared before an Institution Classification Committee (ICC).

The ICC reviews the inmate's enemy list to ensure that they were not placed on the same yard as a known enemy.

These protocols were in place to ensure that enemies were not placed on the same yard.

If an inmate approached me with safety or enemy concerns I would temporarily remove that inmate to a safe location until an investigation into his concerns could be completed.

I would then contact my Sergeant, who could conduct an investigation into the inmate's concerns, and determine what action, if any, needed to be taken.

I have read Thompson's Complaint in which he alleges that I pushed him into a cell that he claims was occupied by one of his documented enemies.

I would not have forced Thompson into a cell if he told me that his enemy was already in the cell.

In such a circumstance, I would have placed Thompson temporarily in one of the showers and reported Thompson's claims to my Sergeant.

I believe that I would remember if Thompson had approached me with safety or enemy concerns.

I have no memory of inmate Thompson or his allegation that he was in fear for his safety or that he was forced to share a cell with a known enemy.

(Tucker Decl. ¶¶ 1-13).

Defendant Tucker's evidence establishes the lack of existence of a triable issue of fact. C/O Tucker's evidence establishes that he did not have any knowledge that he did not know of a specific risk that Plaintiff was exposed to, and there are no facts from which Tucker could infer a specific threat of harm to Plaintiff.   That Plaintiff may have been in fear of attack based upon race, religious  or gang classification does not subject  Tucker to liability for failure to protect

13

Plaintiff.  There must be evidence that Defendant Tucker knew of the particular danger to Plaintiff's safety.

In his opposition, Plaintiff declares that "I re-re and repeatedly brought (my safety concerns) to the face of C/O Tucker & as well to 'all named defendants." (Opp'n.; p. 3). Plaintiff declares that Tucker gave him a direct order to be housed with a Radical Musim and that Plaintiff "informed Tucker that I am in (grave danger) of being housed in any cell w/ this inmate Campbell." (Id. p. 7).   Plaintiff explained to Tucker that his Christian faith was incompatible with Inmate Campbell's faith.  Plaintiff repeatedly requested protective custody, but "they all" refused his request.

As noted in his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears.  Regarding inmate Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all." (Pltf.'s Dep. 11:18:07.)   Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no." (Id. 11:33:20.)  Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller.  I did not know Inmate Miller. (Id. 11:50:19.)

The evidence establishes, without dispute, that C/O Tucker did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  Plaintiff's evidence establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not.  Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an opposing gang, Plaintiff would still fall short of the Eighth Amendment standard.  The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing

more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate.  Labatad, 714 F.3d at 1160.   The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that  Lambert posed a specific threat to the Plaintiff.  The Plaintiff had not come forward with evidence establsihing that Lambert was a documented enemy of Plaintiff's, or that there was some particular information that Defendants knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns."  That is the case here.  Plaintiff's evidence establishes at most, a generalized fear of harm.  Defendant Tucker has come forward with evidence that establishes, without dispute, that he did not know of the specific harm to Plaintiff.  Judgment should therefore be entered in Defendant Tucker's favor.

### C.   **Defendant Greene**

Regarding the events at issue, Defendant Greene's declaration establishes the following:

> I have been employed by the California Department of Corrections and Rehabilitation since November 2001.  During that time, I have worked only at Pleasant Valley State Prison.   I was promoted to Lieutenant in 2008.
>
> In October 2004, I was promoted to Sergeant and held this title at the time of the incidents of which Thompson complains.
>
> I have no memory of inmate Thompson or his allegation that he was in fear for his safety or that he was forced to share a cell with a documented enemy.
>
> Protocols are in place to ensure that inmates are not placed on the same yard as a documented enemy.
>
> When an inmate is received at an institution, he appears before the Unit Classification Committee (UCC).  The UCC reviews an inmate's confidential enemy list to ensure that he will not be housed on the same yard as a documented enemy.
>
> Thereafter, all inmates attend UCC hearings on a yearly basis, or more often if indicated.  As such, enemy lists are reviewed at least annually.
>
> In addition, each inmate has an assigned Correctional Counselor who reviews that inmate's enemy list on a routine basis.

15

> When I was Sergeant, if an inmate approached me with safety or enemy concerns, I would temporarily move that inmate to a safe location, such as a holding cell or the program office, where I would interview the inmate regarding his concerns.
>
> I would further investigate the inmate's concerns by pulling that inmate's central file and reviewing his confidential enemy list.
>
> If my investigation validated that inmate's safety or enemy concerns, I would move that inmate immediately to administrative segregation until the inmate could be transferred.
>
> If my investigation indicated that the inmate's concerns were not valid, or that the inmate simply did not get along with his cellmate, and there was not a risk of violence, correctional staff could perform convenience moves.
>
> In such cases, the inmate requesting the move was responsible for finding another inmate that was willing to cell with him.
>
> Correctional staff would then move those inmates on the weekend.
>
> I do not recall having to take either action in regards to inmate Thompson.

(Greene Decl. ¶¶ 1-14.)

Defendant Greene's evidence establishes the lack of existence of a triable issue of fact. Sergeant Greene's evidence establishes that he did not have any knowledge of a specific risk that Plaintiff was exposed to, and there are no facts from which Greene could infer a specific threat of harm to Plaintiff. That Plaintiff may have been in fear of attack based upon race, religious or gang classification does not subject Greene to liability for failure to protect Plaintiff. There must be evidence that Defendant Greene knew of the particular danger to Plaintiff's safety.

In his opposition, Plaintiff declares that he "brought his safety concerns to the attention of Tucker & Greene and again (both defendants) deliberately ignored my pleas to be placed in protective custody & removed from this enemy yard." (Opp'n.; p. 5). Plaintiff also declares that he repeatedly requested protective custody, but "they all" refused his request.

As noted in his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears. Regarding inmate

Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all." (Pltf.'s Dep. 11:18:07.)   Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no."  (Id. 11:33:20.)  Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller.  I did not know Inmate Miller. (Id. 11:50:19.)

The evidence establishes, without dispute, that  Sergeant Greene did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  Plaintiff's evidence establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not.  Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an opposing gang, Plaintiff would still fall short of the Eighth Amendment standard.  The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate.  Labatad, 714 F.3d at 1160.   The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that  Lambert posed a specific threat to the Plaintiff.  The Plaintiff had not come forward with evidence establishing that that Lambert was a documented enemy of Plaintiff's, or that there was some particular information that Defendants knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns." That is the case here.  Plaintiff's evidence establishes at most, a generalized fear of harm.  Defendant  Greene has come forward with evidence that establishes, without dispute, that he did not know of the specific harm to Plaintiff.  Judgment should therefore be entered in Defendant Greene's favor.

**D.**      **Defendant Rincon**

Regarding the events at issue, Defendant Rincon's declaration establishes the following:

> I have been employed part-time as a Correctional Officer for the California Department of Corrections and Rehabilitation since 2003. I have only worked at Pleasant Valley State Prison.
>
> As a Correctional Officer, I do not know the identity of an individual inmate's enemies.
>
> Rather, the Correctional Counselors monitor the enemy lists to make sure that enemies are not placed on the same yard.
>
> In addition, upon arriving at PVSP and then, at least annually, inmates appear before the Institution Classification Committee (ICC).
>
> The ICC reviews inmates' enemy lists to make certain that they are not placed on the same yard as an enemy.
>
> These procedures made sure that enemies would not be placed on the same yard.
>
> If an inmate expressed safety or enemy concerns to me, I would remove him to a secure area, such as one of the showers or the Program Office.
>
> I would then discuss the inmate's concerns with my Sergeant.
>
> Once I brought this information to my Sergeant, he would conduct an investigation into the inmate's safety or enemy concerns and decide what action, if any, needed to be taken.
>
> I only remember having to take such action one time in my career.
>
> In that case, an inmate, not Thompson, expressed his concern to me that he was going to be sexually assaulted.
>
> With the assistance of other Correctional Officers, I removed that inmate from his cell and placed him in another cell.
>
> I then went to my Sergeant and explained the situation.
>
> My Sergeant took control of the situation from there and I had no further involvement.
>
> I do not remember inmate Thompson having ever expressed safety concerns to me. And, I do not remember having to take such action in response to inmate Thompson.

18

(Rincon Decl. ¶¶ 1-15.)

Defendant  Rincon's evidence establishes the lack of existence of a triable issue of fact. C/O Rincon's evidence establishes that he did not have any knowledge of a specific risk that Plaintiff was exposed to, and there are no facts from which Rincon could infer a specific threat of harm to Plaintiff.   That Plaintiff may have been in fear of attack based upon race, religious or gang classification does not subject Rincon to liability for failure to protect Plaintiff.  There must be evidence that Defendant Rincon knew of a particular danger to Plaintiff's safety.

In his opposition, Plaintiff declares that he told Defendants Rincon and Hernandez "that due to these two (enemies) Miller & Campbell, housed in the same building, I respectfully ask not to be forced to be housed in this same building around these enemies."  (Opp'n.; p. 13).

As noted in his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears.  Regarding inmate Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all."  (Pltf.'s Dep. 11:18:07.)  Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no."  (Id. 11:33:20.)  Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller.  I did not know Inmate Miller. (Id. 11:50:19.)

The evidence establishes, without dispute, that  C/O Rincon did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  Plaintiff's evidence establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not.  Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an

opposing gang, Plaintiff would still fall short of the Eighth Amendment standard.  The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate.  Labatad, 714 F.3d at 1160.   The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that  Lambert posed a specific threat to the Plaintiff.  The Plaintiff had not come forward with evidence establishing that Lambert was a documented enemy of Plaintiff's, or that there was some particular information that Defendants knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns." That is the case here.  Plaintiff's evidence establishes at most, a generalized fear of harm. Defendant  Rincon has come forward with evidence that establishes, without dispute, that he did not know of the specific harm to Plaintiff.  Judgment should therefore be entered in Defendant Rincon's favor.

### E.   **Defendant Hernandez**

Regarding the events at issue, Defendant Hernandez's declaration establishes the following:

> In 2006, I was employed as a Correctional Officer at Pleasant Valley State Prison (PVSP).
>
> I have no memory of inmate Thompson or his allegation that he was in fear for his safety or that he was forced to share a cell with a known enemy.
>
> As a Correctional Officer, I did not know the identity of an individual inmate's enemies.
>
> Upon arriving at PVSP and then, at least annually, inmates appear before the Institution Classification Committee (ICC).
>
> The ICC reviews inmates' enemy lists to make certain that they are not placed on the same yard as an enemy.
>
> In addition, the Correctional Counselor assigned to an inmate would review his confidential enemy list to make sure that he was not housed with a documented enemy.

20

Enemy concerns are taken seriously.  These protocols are in place to make certain that an inmate is not placed on the same yard as an enemy.

If an inmate had expressed safety or enemy concerns to me, I would temporarily place that inmate in one of the showers or in the Program Office.

I would then contact my supervising Sergeant who would conduct an investigation and determine what course of action to take.

I would never force an inmate to cell with an enemy or with an inmate about whom he expressed safety concerns.

(Hernandez Decl. ¶¶ 1-10.)

Defendant  Hernandez's evidence establishes the lack of existence of a triable issue of fact.  C/O Hernandez's evidence establishes that he did not have any knowledge of a specific risk that Plaintiff was exposed to, and there are no facts from which Hernandez could infer a specific threat of harm to Plaintiff.   That Plaintiff may have been in fear of attack based upon race, religious or gang classification does not subject Hernandez to liability for failure to protect Plaintiff.  There must be evidence that Defendant Hernandez knew of a particular danger to Plaintiff's safety.

In his opposition, Plaintiff declares that he told Defendants Rincon and Hernandez "that due to these two (enemies) Miller & Campbell, housed in the same building, I respectfully ask not to be forced to be housed in this same building around these enemies."  (Opp'n.; p. 13).

As noted in his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears.  Regarding inmate Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all." (Pltf.'s Dep. 11:18:07.)    Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and

that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no." (Id. 11:33:20.) Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller. I did not know Inmate Miller. (Id. 11:50:19.)

The evidence establishes, without dispute, that C/O Hernandez did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm. Plaintiff's evidence establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not. Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an opposing gang, Plaintiff would still fall short of the Eighth Amendment standard. The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate. Labatad, 714 F.3d at 1160. The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that Lambert posed a specific threat to the Plaintiff. The Plaintiff had not come forward with evidence establishing that Lambert was a documented enemy of Plaintiff's, or that there was some particular information that Defendants knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns." That is the case here. Plaintiff's evidence establishes at most, a generalized fear of harm. Defendant Hernandez has come forward with evidence that establishes, without dispute, that he did not know of the specific harm to Plaintiff. Judgment should therefore be entered in Defendant Hernandez's favor.

### F.   **Defendant Deathriage**

Regarding the events at issue, Defendant Deathriage's declaration establishes the following:

> I have been employed by the California Department of Corrections and Rehabilitation (CDCR) since 2003. In 2005 and 2006, I was a Correctional Officer at Pleasant Valley State Prison. I was promoted to Sergeant in 2007 and am currently a Sergeant at Pleasant Valley State Prison.

As a Correctional Officer, I did not know the identity of an individual inmate's enemies.

An inmate's Correctional Counselor monitors the enemy lists to make sure that enemies are not placed on the same yard.

Moreover, upon their arrival at PVSP and on, at least, an annual basis, inmates would have appeared before an Institution Classification Committee (ICC).

The ICC reviews the inmate's enemy list to ensure that enemies are not placed on the same yard as a known enemy.

These protocols were in place to ensure that enemies were not placed on the same yard.

If an inmate approached me with safety or enemy concerns I would temporarily remove that inmate to a safe location until an investigation into his concerns could be completed.

I would then contact my Sergeant, who would conduct the investigation, and determine what action, if any, needed to be taken.

I would have had no further involvement once I contacted my Sergeant.

I have no memory of inmate Thompson or his allegation that he was in fear for his safety or that he was forced to share a cell with a known enemy.

I do not remember inmates Miller or Campbell either.

We take safety concerns very seriously and I would never force an inmate to cell with an enemy or with an inmate about whom he expressed safety concerns.

(Deathriage Decl. ¶¶ 1-12.)

Defendant Deathriage's evidence establishes the lack of existence of a triable issue of fact. Sergeant Deathriage's evidence establishes that he did not have any knowledge of a specific risk that Plaintiff was exposed to, and there are no facts from which Deathriage could infer a specific threat of harm to Plaintiff. That Plaintiff may have been in fear of attack based upon race, religious or gang classification does not subject Deathriage to liability for failure to protect Plaintiff. There must be evidence that Defendant Deathriage knew of a particular danger to Plaintiff's safety.

In his opposition, Plaintiff declares that he informed Deathriage of the "dangerous enemy situation" and that "there is documentation in PVS prison records that vividly states . . . Campbell is not to be housed near or around Thompson." (Opp'n.; p. 14.)   Plaintiff does not come forward with any documentation to support this statement.

As noted in his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears.  Regarding inmate Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all." (Pltf.'s Dep. 11:18:07.)   Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no." (Id. 11:33:20.)  Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller.  I did not know Inmate Miller. (Id. 11:50:19.)

The evidence establishes, without dispute, that  Sgt. Deathriage did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  Plaintiff's evidence establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not.  Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an opposing gang, Plaintiff would still fall short of the Eighth Amendment standard.  The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate.  Labatad, 714 F.3d at 1160.   The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that  Lambert posed a specific threat to the Plaintiff.  The Plaintiff had not come forward with evidence establishing that Lambert was a

documented enemy of Plaintiff's, or that there was some particular information that Defendants

knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns."

That is the case here.  Plaintiff's evidence establishes at most, a generalized fear of harm.

Defendant  Deathriage has come forward with evidence that establishes, without dispute, that he

did not know of the specific harm to Plaintiff.  Judgment should therefore be entered in

Defendant  Deathriage's favor.

G.    **Defendant Huckabay**

Regarding the events at issue, Defendant Huckabay's declaration establishes the

following:

> I have been employed by the California Department of Corrections
> and Rehabilitation since 1995.  From 1995 through June 2013, I
> was employed at Pleasant Valley State Prison.
>
> Each inmate is assigned a Correctional Counselor who monitors
> that inmate's enemy list to make sure that enemies are not placed
> on the same yard.
>
> In addition, upon arriving at PVSP and then, at least annually,
> inmates appear before the Institution Classification Committee
> (ICC).
>
> The ICC reviews inmate's enemy lists to make certain that they are
> not placed on the same yard as an enemy.
>
> Enemy concerns are taken seriously.  These protocols are in place
> to make certain that an inmate is not placed on the same yard as an
> enemy.
>
> If an inmate approached me with enemy concerns, I would move
> that inmate to a safe location until an investigation could be
> completed.
>
> My investigation into an inmate's safety concerns would be limited
> to checking his confidential enemy list in his central file.
>
> I would also have contacted a Correctional Counselor or a member
> of the Investigative Services Unit to investigate the inmate's
> concerns more fully.
>
> I would also contact either a Facility Lieutenant or Captain to
> apprise them of the situation.

> If an inmate's safety enemy concerns were valid, the inmate would be moved to administrative segregation until permanent, safe housing could be found.
>
> Although I do not recall inmate Thompson, I would not have ignored his concerns.
>
> I would have conducted an investigation into his safety concerns and contacted my superiors.
>
> If his concerns were substantiated, I would have ensured that Thompson was moved to a safe housing placement.

(Huckabay Decl. ¶¶ 1-13.)

Sgt. Huckabay's evidence establishes the lack of existence of a triable issue of fact.  Sgt. Huckabay's evidence establishes that he did not have any knowledge of a specific risk that Plaintiff was exposed to, and there are no facts from which he could infer a specific threat of harm to Plaintiff.   That Plaintiff may have been in fear of attack based upon race, religious or gang classification does not subject  Huckabay to liability for failure to protect Plaintiff.  There must be evidence that Defendant Huckabay knew of a particular danger to Plaintiff's safety.

As noted in his deposition, however, Plaintiff clearly indicates that he did not know any of the inmates that attacked him, and that his fears were generalized fears.  Regarding inmate Stringer, Plaintiff testified that "I didn't know him."  When asked whether he knew inmate Stringer prior to being placed in Plaintiff's cell, Plaintiff testified "No, sir, not at all."  (Pltf.'s Dep. 11:18:07.)   Regarding inmate Campbell, Plaintiff clearly indicates that his fear was based upon the fact that Campbell was a Muslim and Plaintiff was a Christian.  When asked whether he knew Campbell prior to being celled with him, Plaintiff testified that" "Mr. Dore, true to my word, I've never seen that man in my life until he came to the cell door and said who he was and that, that and the other, and when it came out he's a Muslim, and I said no, no, no, Lord, no."  (Id. 11:33:20.)  Regarding inmate Miller, Plaintiff testified that "I did not have a problem with Inmate Miller.  I did not know Inmate Miller.:  (Id. 11:50:19.)

The evidence establishes, without dispute, that  Sgt. Huckabay did not know of a specific harm to Plaintiff and act with deliberate indifference to that harm.  Plaintiff's evidence

establishes, at most, some generalized fear of harm based upon membership in the Bloods gang or the fact that Campbell was a Muslim and Plaintiff was not.  Even if Plaintiff were able to come forward with evidence that defendants knew a potential cellmate was a member of an opposing gang, Plaintiff would still fall short of the Eighth Amendment standard.  The Ninth Circuit has held that inmates of opposite gangs placed in a cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison official must be aware of a specific risk to an inmate.  <u>Labatad</u>, 714 F.3d at 1160.   The facts alleged in that case suggested that although Plaintiff did fear for his safety, there was no specific information that Defendants knew from which they could draw an inference that  Lambert posed a specific threat to the Plaintiff.  The Plaintiff had not come forward with evidence establishing that Lambert was a documented enemy of Plaintiff's, or that there was some particular information that Defendants knew of and disregarded, other than Plaintiff's statement that Lambert was not of "like concerns." That is the case here.  Plaintiff's evidence establishes at most, a generalized fear of harm. Defendant  Huckabay has come forward with evidence that establishes, without dispute, that he did not know of the specific harm to Plaintiff.  Judgment should therefore be entered in Defendant  Huckabay's favor.

**V.**	**Conclusion and Recommendation**

Plaintiff alleges that Defendants failed to protect him from injury.  Defendants, however, have come forward with evidence that establishes, without dispute, that they did not know of any particular harm to Plaintiff.  Plaintiff's evidence establishes, at most, a speculative and generalized fear of harm.  That Plaintiff was clearly in fear of injury by his cellmates does not subject Defendants to liability.  There must be evidence of an identifiable serious risk to Plaintiff's safety. Defendants' evidence establishes, without dispute, that they did not know of a particular risk to Plaintiff's safety.   Accordingly, IT IS HEREBY RECOMMENDED that Defendant's motion for summary judgment be granted, and judgment be entered in favor of defendants and against Plaintiff.

These findings and recommendations are submitted to the United States District Judge

27

assigned to the case, pursuant to the provisions of 28 U.S. C. § 636(b)(1)(B).  Within thirty days after being served with these findings and recommendations, plaintiff may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834 (9th Cir. 2014)(citing <u>Baxter v. </u>Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **February 23, 2015**

**/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE